Mr. Rowe. Thank you, Your Honor. May it please the court. Descart Begay was convicted on the basis of one witness's testimony, and during trial that witness was allowed to testify with prior consistent statements and with hearsay. We believe both rulings were error. Meanwhile, Mr. Begay couldn't confront that witness with lies that she told to law enforcement on the day she made the allegation. That evidentiary ruling was also error, and we believe those errors were far from harmless. You mentioned that that's the only – well, you mentioned that he was convicted based on one witness's testimony, but there was physical evidence and there was other things other than that witness's testimony, correct? Well, there were – DNA analysis was taken, if that's what you mean by physical evidence, yes. Our argument and position was that the encounter was consensual, and so the existence of DNA evidence wasn't surprising. But there were also injuries to the victim as well, right? Well, I disagree with that. There certainly was conflicting testimony. There were photographs taken of a handful of what I would characterize as minor abrasions. There was testimony that some of those abrasions were days old when the photographs were taken, and so I disagree that there were physical injuries suggesting that there was separate evidence. And I would also point out that at sentencing, and this is in our papers, we had an argument about whether there was a serious injury and whether that enhancement could be applied, and the government argued only that this was a mental health injury, not that there was a physical injury. And so to answer your question, I don't think those physical injuries were enough to overcome our view that this was kind of a one witness case. And so to talk a bit about prior consistent statements, it was our theory that SS, the alleged victim, was lying about the encounter. As I just mentioned, it's our belief that the encounter was consensual and that she later regretted it. And the government responded to that by trying to bolster her testimony, and they did so in an acute way on redirect examination, where the question was asked about statements that SS had made to law enforcement. And the question posed to her was, after July 3, 2020, you repeatedly told law enforcement that Mr. Begay raped you, correct? There was a timely objection. The government came back to this theme in closing argument, and this was in our papers, but it bears emphasizing. And the government argued every single person that SS has disclosed this rape to has been consistent. She has been unequivocal each and every time. But here's the problem I'm having. I think the rule allows what the government did. You are right that subsection, I guess, little i in Rule 801 says the motive to fabricate. But then it uses a disjunctive or, and says to rehabilitate the declarant's credibility when attacked on another ground. And here, you just told me that you attacked the credibility based on inconsistent statements. And there were other attacks on her credibility as well. So it is true that it was both, but they were rehabilitating the declarant's credibility when it was attacked on another ground, or grounds in this case. The defendant's theory was that this victim was lying, and she was lying. It was our contention, and she was motivated to lie by a fear of her abusive and estranged husband. This came out in testimony with SS herself. This came out in testimony with SS's mother, and then it was argued to the jury. And so our position this entire time was she was motivated to lie by this fear. And it was an acute fear, because this person had assaulted her, had drawn weapons on her. She had an order for protection. So this wasn't a fanciful defense or a fanciful fear. You can make that argument without using her inconsistent statements. You can say, look, all of these statements are lies, because she had a motive to fabricate. But you actually picked out statements and said, your testimony, you said this, and now you're saying that. That is another ground. I respectfully disagree, because it was all in service of the defense that she was motivated to lie about this encounter. And it was our view, and we elicited that trial, is that she lied about being strangled. She told the nurse, the same nurse, that she had been strangled eight out of ten for more than a minute. We said that was a lie. And we said it was a lie because there was no physical evidence. There was no pictures. There was no treatment to her neck. And that lie was in service of her fear of her abusive and estranged husband. And so it's our position that we're proceeding under Romanet I of Rule 801, what is it, D-1B. And the Portillo case from the Fifth Circuit, I think, makes this distinction that you're drawing. This was the only case that we could find that has interpreted the Romanet II, which is a 2014 revision to this rule. And that Portillo analysis was saying is when you're talking about a motivation to lie, you are proceeding under Romanet I. And Romanet II doesn't then swallow what Romanet I has always said. And so we know United States v. Tome still applies to 801. That wasn't abrogated from the amendment. We know a century's worth of common law wasn't abrogated. And we know that because the Rules Committee said so. The Advisory Committee notes said these things are still good law. But when you're looking at a motivation to lie, the point in time that that motivation is developed is important. Anything before, any statement before that can come in as a prior consistent statement. Anything that comes after cannot. Let's assume that this was error. Could you address why it's not harmless in light of the fact that SS had already testified in great detail about the assault? Well, it is our view, of course, that it is not harmless. And we point to the Kenyon case, the Bearcer case, both cited in our briefs. Those are instances where we had an evidentiary error that wasn't harmless. And the issue there was that when you're talking about a one witness case and you're bolstering that witness's testimony with out-of-court statements, then the harmless error analysis changes. And so when the government returned to this theme in its summation and asked the jury to make inferences in support of this witness based on all of the times that she had supposedly told the same story, that's what takes us out of harmless error analysis in our view. I was just going to ask, on the prior issue, you're right, there is a circuit split. There's the Fifth Circuit case, but there's a case from the Second Circuit called Flores that we found where the witness's credibility was questioned on both grounds, a motive to fabricate and other grounds. So sort of a similar situation, not identical, but similar situation. The Second Circuit said, hey, we apply Romanet 2 as well. We apply both provisions, 1 and 2. So as to the motive to lie, that's one thing. As to the other grounds, then it becomes admissible as long as it's connected to Romanet 2. And I don't know if you're familiar with that case, but any responses? I haven't read Flores. I apologize. You know, we found Purcell, which was a Second Circuit case that sounds like preceded Flores. And Purcell was decided essentially on a harmless error ground from what we can tell. It didn't squarely address the question, Judge Strauss, that you just presented. But I respectfully would say that the Second Circuit in Flores is wrong because of, one, what the advisory committee notes say. Essentially, the committee says this isn't a sea change in how we're addressing prior consistent statements. We say tome still applies. We say common law still applies. But I would add to that that if Romanet 2 were as broad as the district court posited and as broad as the government posited, then Romanet 1 is superfluous. There's no reason for it. And so Romanet 2 cannot be, any time you impeach a witness, any time you point out something inconsistent, you're permitted to bring a prior consistent statement in because I think that reads Romanet 1 out of the rule. I do, if we could, briefly want to touch on excited utterance. And this court is well familiar with the purpose of the rule, with the six factors that this court has set forth. And certainly some of the factors go the government's way. Some of the factors go our way. For example, this isn't a minor child who made this statement. 30 minutes, we know, this court has said, is on the outside bounds. She was asked questions and she responded. And so I accept that those factors can go both ways. But here's where we think we're on the right side of this issue, which is this court has repeatedly said that deliberation and reflection vitiate the exception to the rule. And we know that's what happened here. We know she deliberated and reflected for 20 minutes, as her mother testified, when she was visiting her father's grave in between the time of the alleged assault and the time she made the statements. And what do we know that she did while she was deliberating? This is at page 541 of the trial transcript. She said she was at her father's grave and she decided at that moment that she was going to swallow it. She didn't want any trouble. She didn't want to tell her siblings. She didn't want to tell the police. She was going to swallow it. She then says she was going to swallow it because she didn't want her son involved, who was present at the time of the alleged assault. This is evidence that somebody was thinking about what had happened, was deliberating on what happened, and that takes us outside of the six factors, in our view, and takes us into classic hearsay outside the exception of excited utterance. Lastly, I'm happy, of course, to talk about the sentencing issues, but I also want to briefly address a confrontation in my opening remarks. And we're well aware that Rule 412 applies. We're also well aware that Rule 412 doesn't place limitations on constitutional questions. Our argument here is that on the day of the alleged assault, SS reported to law enforcement that she hadn't had sexual activity in the prior 72 hours. That turned out to be false based on the DNA analysis that we had already found. Our point in wanting to confront her with that falsehood is that she was making allegations against Mr. Begay at the very same time that she also lied to law enforcement. This wasn't a testimony or planned questions cataloging her prior sexual partners. This was specifically and directed towards lies she told when she reported the assault to law enforcement that day. We think we should have been permitted to question her, and we think it's a Sixth Amendment problem. If I could, I'd like to reserve time. Mr. Genrich. Thank you, Your Honor. May it please the court, counsel? Good morning. David Genrich on behalf of the government. I'd like to focus primarily on the 801 issue, but before turning to that, I'd just like to say at the end of the day, this is a case that in the government's view, this court should absolutely affirm the jury's verdicts. This was a closely contested case before the jury. The victim gave compelling testimony that this jury credited. As Judge Strauss pointed out, it was corroborated by DNA evidence and by injuries. We're not here to relitigate what the jury thought about the conflicting testimony on injuries. They made the credibility determinations in favor of a verdict of guilty, and they should be and will be upheld on appeal with respect to the standard of review. The jury made careful consideration of the evidence and returned a verdict that was different as to various counts. Depending on the government's view, based on the corroboration, Judge Strauss indicated namely that DNA skin cell was matched to the gay that corroborated at least digital penile penetration, and that was conceded by the defense expert. So the evidence here was more than sufficient, and because the evidentiary challenges are so narrow and are harmless even if there was error, which the government submits they're not, the verdicts here should absolutely be affirmed. What about the two counts where he was acquitted? Does that draw into question the harmless error analysis, if we were to get there, on some of these issues, the fact that he was partially acquitted? It doesn't, Your Honor, and I do want to address harmless error in each of the evidentiary issues, but the accounts on which he was acquitted related to allegations of oral contact, mouth to the victim, the defendant's mouth to the victim, or the victim performing oral sex on the defendant. The victim indicated she never performed oral sex on the defendant in her testimony, and there was some testimony about a struggle with respect to the defendant trying to get her to accomplish that, which allowed the government to survive Rule 29, but the jury clearly parsed the evidence in a way that said, in the government's view, we don't have forensic corroboration of this attempt to conduct oral sex. So we're going to take the conservative route, we're going to carefully parse the evidence, and we're going to take our standard of beyond a reasonable doubt seriously, and we're going to convict him on those counts where we've got additional corroboration in addition to the victim's testimony, which would have been enough. So I do want to talk about 801D, and I think in the government's view, what might be helpful to the court is just to review the record as to the July 3rd statements of the victim, and I'll do it quickly. In other words, as counsel noted, really the 801D1 argument is about statements given after July 3rd, whether the victim consistently told law enforcement after July 3rd that she had been raped. So what statements came in about July 3rd, and on what basis? Because they were not 801 grounds. So she made a statement on July 3rd to her mother, the excited utterance, and of course that is fully briefed to the court. The defense objected below, preserved it, and that's part of the argument before the court today. She told her husband on the phone that she'd been raped. That's at pages 543 to 544, 661 of the transcript. Defense did not object to that conversation at trial, and that's not before the court on appeal. She told the responding officer that Begay had attempted to rape her. That's at pages 50 to 51 of the transcript. The defense objected at the time, and they were admitted as excited utterances. The defense is not pursuing that on appeal. He's not challenging that the district court improperly admitted the statements to the responding officer. So those were subsequently admitted, not challenged on appeal. She told the EMT that Begay had raped her. That's at page 123, and it was examined on cross at page 132. No objection below, not challenged on appeal. Of course, she gave a very detailed statement to the same nurse. Both parties wanted that statement in. It's Government Exhibit 33. On a pretrial basis, you see a Begay Addendum 15 that he wants it in, and at trial he doesn't object to 268. She gave a statement to the FBI agent that same day, July 3rd, and the defendant introduced those statements on cross-examination seeking to impeach her, and those are summarized at pages 17 and 18 of the government's brief. Why are these important? One, the scope of the 801D argument is only post-July 3rd statements, because all of these other statements came in on other substantive grounds, other than the excited utterance to the mother, not challenged on appeal. Two, they're important for the harmless error analysis that Judge Grasso mentioned, because in all the harmless error analysis cases, including Bercier and Kenyon relied upon by the defense, including in Portillo where they found no harmless error, the courts compare what the 801D statement was to what the other statements made by the victim were at trial, the detailed testimony at trial, but also any other duly admitted statements that provided the same information. Here, the two most detailed statements, the victim's testimony at trial and the same testimony, were admitted without objection, the same report without objection. Far more detailed than the 801D, which are one answer responses to two questions. After July 3rd, did you continue to tell law enforcement you'd been raped? Yes. Did you ever tell them you hadn't been raped? No. On this record, those are absolutely harmless inquiries compared to the more detailed statements she gave to the same nurse at trial, and then these other instances where she said she'd been sexually assaulted that are not before this court. Let me get to the substance of the 801D and the court's inquiries about whether it was properly admitted. Judge Strauss, I do think that the addition in 2014 of subsection 2 was intended to cover the scenario where the victim's credibility is attacked on inconsistencies. And what the committee notes say to the 2014 amendment, this is in the third full paragraph, it says, the amendment retains the requirements set forth in tome that a consistent statement offered to rebut a charge of recent fabrication has to come before. The government concedes that. Section 1 says if you're going to offer it for purposes of rebutting a charge of recent fabrication, it's got to come before the fabrication. Here's the next sentence. The intent of the amendment is to extend substantive effect to consistent statements that rebut other attacks on a witness, such as the charges of inconsistency or faulty memory. So in the government's view, the way the defense wants to read this rule is that subsection 2 was never added in 2014. And that once you allege fabrication, anything goes against the victim. Because the only way to rehabilitate her is to allege that there was a statement before the fabrication. That's the silver bullet for the defense. If you fabricated it immediately, we can attack you on chronic drug use, like they did in this case. We can attack you on prescription medication, psychiatric medication, like they did in this case. We can attack you based on severe mental illness, like they did in this case. All on her cross. They can argue in closing that she's a troubled young woman suffering from an evil stew that rendered her erratic, unreliable, and untruthful in court. Erratic and unreliable and untruthful in court. The rule was not contemplated to allow that sort of impeachment. That is impeachment, frankly, that went well beyond just inconsistency with prior statements. That's impeachment on other grounds about faulty memory and about unreliability, about lying and inconsistency. So we've got to give meaning to Part 2. The committee note in part does that. Portello, the case cited by the defendant, does that. In Portello, there are two groups of statements at issue. One relates to the Romo brothers. And what the Portello court said was as to those hearsay statements, the only ground that was being rebutted was the charge of fabrication. And then there were some statements related to a woman last named Merla, M-E-R-L-A. And what Portello court said there is she's alleged to have fabricated as well because she was angry with the defendant about kicking her or someone out of a gang. That she fabricated because she was angry at the defendant. But Portello court says they also impeached her with inconsistencies. And because they impeached her on grounds other than fabrication, the district court's decision to admit rehabilitative evidence was appropriate as to her. So even the Portello court recognizes that when you escape the confines of impeachment limited to the four corners of fabrication. As Judge Strauss noted, you could say you lie because you were afraid of your husband and ended at that. Not only did they go to inconsistent statements, the court doesn't even have to decide it that narrowly. Because in this case the impeachment went well beyond that. Both in her testimony, they impeached on chronic drug use at page 568 of the transcript. On mental health issues at pages 568 to 569. This is all of the victim. Psychiatric medications at 569 and then referenced pill bottles on her dresser at pages 594 to 95. And of course also raised domestic assaults at 650 to 651. So those were subjects of her cross-examination. The same things that were revisited in closing with respect to impeaching her on grounds other than fabrication due to fearing her husband. To the court's question on Flores. Flores was cited in Portello, the case replied upon by the defendant. And Portello basically identifies the split that Judge Strauss noted. Saying in some courts recognized, including in Flores, that even if the other grounds aren't the main thrust of impeachment, subsection 2 allows you to rehabilitate if they were impeached on other grounds. And although Portello is highlighted by the defense, they do note in a footnote, and the district court noted in her order, that the Second Circuit in Purcell, and that's cited in the district court's order, did address subsection 2 post-2014. And in Purcell, they go at great length to describe the alternative basis of admission that subsection 2 permit. Namely, if it's not being admitted to rebut fabrication, it still can be admitted if the credibility was attacked on other grounds. I'd end the 801 from the government's perspective and welcome questions from the court with this. The way the defense would read the rule is as if the rule read, subsection 1, you can submit rehabilitation to rebut charges of recent fabrication. Or 2, you can rehabilitate the victim's credibility if it's attacked solely on another ground. That only if you attack them on the basis of something other than fabrication can you attempt to rehabilitate. And that turns the rule on its head. As the court noted, it's expressed in the disjunctive. You can rehabilitate if they attack for fabrication, but you also may rehabilitate if they attack on other grounds. You aren't limited to rehabilitating only if they attack on other grounds. Fabrication does not give the defense carte blanche to attack a victim's credibility on any grounds they wish without rehabilitation. So one thing that concerns me, and opposing counsel sort of brought this up, is reading it the way the government reads the rule also has its own problems, I think. Which is, he would say, I think, and he can certainly argue on his own, but it hamstrings the defense to read it that way. Because what ends up happening is you may have substance abuse and you may have this, that, and the other thing and all these different ways to attack the credibility in addition. But if you're trying to make an 801 argument, you're limited to, well, all you, is the motive to fabricate. So it really, to go down that road of keeping the prior consistent statements out, you really have to hamstring your defense. Well, a couple of responses. One, I think we've got to interpret the plain language of the rule, which provides that the witness can be rehabilitated in either scenario. And there are reasons for that, and I think I've tried to explain those to the court. That we can't let this be open season on a witness when a defendant alleges fabrication. And now we get to allege incredibility on all these other grounds, and the committee notes reflect that. Two, I don't think that's any different, frankly, than most rules of evidence. Or the position the government's in in making decisions about whether to open the door to areas of inquiry or defense cross-examination. That all the rise remains shut because the government hamstrings itself by not choosing to pursue those lines of argument. Of course the defense has decisions to make, just as the defense decides whether to put the defendant on the stand. That may hamstring the defendant in making arguments in closing, right? If you decide that the defendant's going to testify. The defense is forced to make decisions about what forms of impeachment they want to use against the victim, and what are going to be most probative and effective before the jury. But, on the flip side, they don't get to introduce new forms of impeachment, and then get insulated against rehabilitation merely because they have also alleged fabrication. That, in turn, would hamstring the government in rehabilitating the witness in a way that's completely unfair. And against the weight of the evidence, to the extent the evidence shows that the witness provided prior consistent statements, or otherwise can be rehabilitated based on the nature of the attack. I would like the court to pull through the same arguments on harmless air. The 412 Confrontation Clause issue, I think, is fully briefed. The government rests on this brief. The district court did not abuse its discretion. The jury would not have received a significantly different impression under harmless air for the same reasons I just discussed. And the scope of the inquiry on 412 Confrontation Clause that was excluded was only about the time frame in which the victim had consensual sexual encounters with two other individuals. Whether it was on the July 4th weekend or before that. The fact she had sexual encounters with the other two, and therefore they could be the source of semen or injury, was submitted to the jury. And the excited utterance in the government's view is not a close question under this court's law. And the facts don't support that she deliberated before speaking to the mother. Thank you very much, Your Honors. Thank you very much. Mr. Rowe. Thank you, Your Honor. There's a few things I'd like to respond to. I want to start with the question about whether the acquittals on four of the eight charges speak to harmless air. And there was a suggestion that the testimony wasn't strong enough on oral copulation. And I disagree with that. One, because our halftime motion on that very issue was denied. And so clearly the district court must have thought that there was some evidence of oral copulation, such that a reasonable jury could find a guilty verdict on those four counts. But I'd also point to the trial testimony at pages 535 and 536 that discussed this very issue, where there's an allegation that Mr. Begay orally copulated or attempted to orally copulate SS. And so there was evidence, and a jury found that it was insufficient to convict on those grounds. And so I think very much so that that goes to the harmless air analysis. Counsel, I just want to ask you, you heard opposing counsel talk about a lot of other things outside of inconsistent statements. So substance abuse, I forget all the different things he named. But do you agree that there was some impeachment on those other grounds as well? I don't. Well, so what I wrote down was substance abuse and prescription medications for mental health. There may have been others, but those are the two I caught. Substance abuse, that wasn't a subject of impeachment. That was a substance to demonstrate that it was a consensual encounter. It was our belief, and the photographic evidence showed, that there was a plate with marijuana on it and that the two, Mr. Begay and SS, who had been acquaintances, were smoking marijuana that day, and that it turned into a physical situation. So I don't agree that that was a basis of impeachment. And for that matter, I don't agree that the prescription medication issue was much of an impeachment. We weren't arguing and didn't argue to the jury that this is a person that had faulty memory. And so, again, if you go back to the advisory committee notes, one of the two, quote, other grounds mentioned there are inconsistencies and faulty memory. We didn't argue that this person was having a faulty memory in summation. With respect to inconsistencies, it's our view that inconsistencies cannot mean general impeachment. And it's for the reason that I mentioned in my opening remarks, which, if that were true, if inconsistencies meant any old, generic, general impeachment, then Roman at one has no place in Rule 801. And with that, those were the items I wanted to address. And unless there are any other questions, we urge the court to reverse and remand for a new trial. Thank you. Thank you for the argument. Thank you, both counsel, for the argument.